526 S.E.2d 310

Victor HOLMES, Defendant
Below, Appellee,

v.

The BOARD OF EDUCATION
OF BERKELEY COUNTY,
Appellee Below, Appellee,

and

David Rogers, Intervenor/Appellee
Below, Defendant.

No. 25979.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 21, 1999.

Decided Nov. 17, 1999.

Dissenting Opinion of Chief Justice
Starcher Jan. 12, 2000.

Daniel C. Staggers, Esq., Staggers & Staggers, Keyser, West Virginia, and Suzanne M. Weise, Esq., Patrick C. McGinley, Esq., Morgantown, West Virginia, Attorneys for Holmes.

Erwin Conrad, Esq., Fayetteville, West Virginia, Attorney for Berkeley County Board of Education.

Lawrence M. Schultz, Esq., Burke & Schultz, Martinsburg, West Virginia, Attorney for Rogers.

MAYNARD, Justice:

The question before us is which of two applicants, David Rogers or Victor Holmes, should be awarded the position of head varsity basketball coach at Martinsburg High School (MHS). The defendant, David Rogers, appeals from the September 30, 1998 order of the Circuit Court of Kanawha County, West Virginia, which reversed the decision of the West Virginia Education and State Employees Grievance Board (Grievance Board) and reinstated Victor Holmes to the position. Rogers contends the circuit court erred. We agree.

### FACTS

The facts in this case are essentially uncontroverted. Prior to the 1994–95 school year, David Rogers served as head varsity basketball coach at MHS for nineteen years. During nine of those years, he was also assistant principal of the high school. A principalship then opened at South Middle School (SMS) for the 1994–95 school year. Rogers applied for the position. The superintendent of Berkeley County schools, James Bennett, informed Rogers he could not be both a coach and a principal. Rogers thereafter resigned from the coaching position and was granted the principalship.

A permanent coaching position was subsequently posted. The appellee, Victor Holmes, who had served for nineteen years as junior varsity coach with Rogers at MHS, along with varsity coaches from other regions of West Virginia, applied for the vacancy. However, the posting was withdrawn and a new position for a one-year, interim coach was posted. The only applicant was Holmes. He was hired as the interim coach and coached the 1994–95 MHS team.

At the end of the school year, the interim position expired and the coaching position was again posted. The Berkeley County Board of Education (Board) chose not to hire anyone at that time. The vacant position was once again posted on September 19, 1995. After the September posting closed, MHS principal, David Deuell, formed a selection committee to recommend a candidate for the position. The posting drew two applicants, David Rogers and Victor Holmes. Both were interviewed by the committee. The committee's vote was split 4–4, with Deuell ultimately casting the deciding vote in favor of Rogers. Committee member Dr. Taylor Perry objected to the vote and discussed the matter with the superintendent

and Deuell. Thereafter, Deuell agreed to withdraw his vote for but not his recommendation of Rogers.

Superintendent Bennett sent the Board members a memorandum explaining the reasons he intended to recommend Holmes for the position. The superintendent based his recommendation of Holmes upon his belief that no principal should serve as a coach and, also, upon equity in pay. In other words, if Rogers were awarded the coaching position, he would rank second in pay in the system, earning only $8.90 less per day than the superintendent. The final reason given for recommending Holmes was that if Holmes filed a grievance, he would have a better than average possibility of prevailing. The Board rejected Holmes by a vote of 3-2. Superintendent Bennett then recommended Rogers, who was approved by a vote of 5-0. Rogers successfully served as both principal and coach during the 1995-96 basketball season.

Holmes filed a grievance, alleging the Board acted arbitrarily and capriciously. The Level I hearing took place before Principal Deuell, who denied the grievance. Holmes appealed to Level II. The Level II hearing was held before the superintendent's designee, Basil R. Legg, Jr., after which Holmes was awarded the position. Rogers intervened and appealed. The Board waived the matter to Level IV.

At Level IV, the Grievance Board hearing examiner (ALJ) found that the superintendent told Rogers during his interview that he would not be recommended for the position because he was a principal even though Bennett thought Rogers "was 'probably' the best qualified applicant." The ALJ reasoned that a majority of the Board simply disagreed with the superintendent's philosophy and that he could not substitute his judgment for that of the Board. The ALJ then concluded that "[c]ounty boards of education are authorized to hire coaches under extracurricular contracts pursuant to *W.Va.Code* § 18A-4-16, which does not designate how, or under what standard, extracurricular assignments to professional personnel for coaching positions are to be made." The ALJ could not "find that the Board's decision to hire [Rogers] over [Holmes] was arbitrary and capri-

cious, or clearly wrong." Rogers was reinstated to the coaching position.

Holmes appealed the Level IV decision to circuit court, where the decision was reversed and the position was finally awarded to him. The circuit court found that the primary reason the superintendent believed Rogers should not serve as coach was because Rogers was a principal. The court quoted Bennett as stating, " 'the principalship in any school, and particularly a high school or a middle school is a full-time job.' " The court · also found the superintendent based his decision on W.Va.Code § 18A-2-9, which prohibits principals who work at schools with a student population of one hundred seventy or more from being assigned teaching duties, and Board Policy GBAA, which states that coaches must be teachers. It is from this order that Rogers appeals.

On appeal, Rogers alleges the circuit court erred for two reasons. First, he contends the court erred by ordering the Board to hire the applicant which is less qualified. Second, he contends the court erred by holding that the term "teacher" as it appears in Board policy GBAA could be construed in a fashion contrary to the definition of "teacher" as it appears in W.Va.Code § 18-1-1(g) (1998).

## STANDARD OF REVIEW

The circuit court's scope of review of a hearing examiner's decision is set forth in W.Va.Code § 18-29-7 (1985), which states in pertinent part:

The decision of the hearing examiner shall be final upon the parties and shall be enforceable in circuit court: Provided, That either party may appeal to the circuit court of the county in which the grievance occurred on the grounds that the hearing examiner's decision (1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board, (2) exceeded the hearing examiner's statutory authority, (3) was the result of fraud or deceit, (4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or (5) was arbitrary or capricious or

characterized by abuse of discretion or clearly unwarranted exercise of discretion.

 This Court has previously said that "[a] final order of the hearing examiner for the West Virginia Educational Employees Grievance Board, made pursuant to W.Va. Code, 18–29–1, *et seq.* (1985), and based upon findings of fact, should not be reversed unless clearly wrong." Syllabus Point 1, *Randolph County Bd. of Educ. v. Scalia*, 182 W.Va. 289, 387 S.E.2d 524 (1989). This standard was later explained by stating that

> [t]his Court reviews decisions of the circuit under the same standard as that by which the circuit reviews the decision of the ALJ. We must uphold any of the ALJ's factual findings that are supported by substantial evidence, and we owe substantial deference to inferences drawn from these facts. Further, the ALJ's credibility determinations are binding unless patently without basis in the record. Nonetheless, this Court must determine whether the ALJ's findings were reasoned, *i.e.,* whether he or she considered the relevant factors and explained the facts and policy concerns on which he or she relied, and whether those facts have some basis in the record. We review *de novo* the conclusions of law and application of law to the facts.

*Martin v. Randolph County Bd. of Educ.*, 195 W.Va. 297, 304, 465 S.E.2d 399, 406 (1995).

After finding the record did not support the Level II determination that the Board relied almost exclusively on community input as their reason for rejecting Holmes;[1] that coaches are hired under W.Va.Code § 18A–4–16 rather than W.Va.Code § 18A–4–7a; and that the most reliable evidence of the superintendent's reasons for recommending Holmes was set forth in his memorandum to the Board, the ALJ concluded the Board did not abuse its discretion or act in an arbitrary or capricious manner in selecting Rogers to fill the coaching position. The circuit court

disagreed and concluded as a matter of law that the ALJ "committed an error of law in failing to consider the Board's refusal to adhere to its own Policy GBAA." The court also concluded W.Va.Code § 18A–2–9 prohibited Rogers from serving as a coach while he was employed as a principal. We review these conclusions of law under a *de novo* standard.

## DISCUSSION

The narrow issue presented in this case is whether a principal of one school may simultaneously serve as the head varsity basketball coach in another school.[2] Holmes argues that Board Policy GBAA and W.Va. Code § 18A–2–9 restrict a full-time principal at a large middle school from serving as a varsity coach at a large high school given the responsibilities of a principal. We disagree.

██ W.Va.Code § 18A–2–9 (1990) is titled "Duties and responsibilities of school principals; assistant principals[ ]" and is included in the chapter titled "School Personnel." The section states in relevant part:

> Upon the recommendation of the county superintendent of schools, the county board of education shall employ and assign, through written contract, public school principals who shall supervise the management and the operation of the school or schools to which they are assigned. Such principals shall hold valid administrative certificates appropriate for their assignments.
>
> \* \* \*
>
> A principal assigned to a school with a net enrollment equal to or greater than one hundred seventy students may not be assigned any teaching duties except on a temporary emergency basis.

Holmes argues that under this code section Rogers may not be assigned a coaching job. He argues this is so because coaching is a

---

1. The Level II Hearing Examiner found that "[t]he reason the Board did not select Mr. Holmes was overwhelmingly based on public opinion and community input."

2. The only other error assigned in this appeal is that the circuit court awarded the coaching posi-

tion to the applicant with lesser qualifications. However, neither Rogers nor Holmes seriously contends the other person is not fully qualified. It seems to us after reviewing the record that the two are equally qualified.

teaching duty and Rogers is a principal of a school with an enrollment of five hundred eighty students.

We do not believe coaching is a teaching duty which is prohibited under W.Va.Code § 18A–2–9. Coaching is specifically included as an extracurricular activity in W.Va.Code § 18A–4–16(1) (1996). This section states in pertinent part:

Extracurricular duties shall mean, but not be limited to, any activities that occur at times other than regularly scheduled working hours, which include the instructing, **coaching**, chaperoning, escorting, providing support services or caring for the needs of students, and which occur on a regularly scheduled basis[.] (Emphasis added).

W.Va.Code § 18A–2–9 is intended to restrict principals to the performance of administrative tasks, prohibiting them from assuming teaching tasks, during the regular school day. This particular code section does not dictate how a principal may or may not spend his or her time after the regular school day ends. Rogers states that basketball practice and basketball games take place during evening hours but does concede that he may at times have to leave before the end of the regular school day to travel with the team. However, he states he has able assistants who cover for him when he must be away from his school. This situation will be handled no differently than one in which he must be away to attend an educational seminar or forced to stay home because of illness. We therefore hold that W.Va.Code § 18A–2–9 (1990) does not prohibit a principal assigned to a school with a net enrollment equal to or greater than one hundred seventy students from simultaneously holding a coaching position.

■ We now consider whether board policy prohibits principals from being coaches. Board Policy GBAA states in pertinent part:

**All coaches shall be teachers either full-time or substitute.** In addition to the usual related duties, he/she shall work the additional time necessary to satisfy the requirement of a coach in any sport or sports assigned and accepted.

To make possible the above, no other position, job, or responsibility shall interfere with teaching and coaching or decrease the time and planning necessary to fulfill these responsibilities. (Emphasis added).

The circuit court determined that even though the policy does not say so, the Board meant the word "teachers" to be "classroom teachers." In ruling on the question of whether this policy prohibits principals from serving as coaches, the court concluded, "Superintendent Bennett's recommendation of Mr. Holmes as men's varsity basketball coach was properly based in part upon and consistent with the Board's own policy to hire only full-time and substitute classroom teachers as coaches." However, when we read and apply the legal definitions of "teacher" and "classroom teacher" to the Board policy, we do not believe the Board intended to include only classroom teachers in the group that could apply for and accept coaching positions. We believe the policy would state "classroom teachers" if that was the Board's intent.

W.Va.Code § 18–1–1(g) (1998) specifically states,

(g) "Teacher" means teacher, supervisor, **principal**, superintendent, public school librarian; registered professional nurse, licensed by the West Virginia board of examiners for registered professional nurses and employed by a county board of education, who has a baccalaureate degree; or any other person regularly employed for instructional purposes in a public school in this state[.] (Emphasis added).

This definition contrasts with the definition of "classroom teacher" which is narrowed in W.Va.Code § 18A–1–1(c)(1) (1997) to include only "[t]he professional educator who has direct instructional or counseling relationship with pupils, spending the majority of his time in this capacity." Principals are explicitly included in the definition of "teacher." The Board's policy states that coaches must be teachers. Therefore, the policy includes principals in the group that can apply for coaching positions.

■ This Court has previously said, "County boards of education are bound by

procedures they properly establish to conduct their affairs." Syllabus Point 2, *Dillon v. Bd. of Educ. of County of Wyoming*, 177 W.Va. 145, 351 S.E.2d 58 (1986). The Board established a procedure which states that coaches must be teachers; the policy says nothing about classroom teachers. According to West Virginia law, principals are teachers. Therefore, according to the Board's policy, principals can also be coaches. The Board is bound by this procedure. In fact, the Board's prior practice supports this conclusion. Rogers previously served as coach of the varsity basketball squad for nine years while simultaneously serving as assistant principal of the high school. No one contends he did not do both jobs successfully.

Education of students is, of course, the primary responsibility of our school system. For this reason, we believe these types of decisions must be made by each county on a case-by-case basis. Under the facts of this case, neither Board policy nor West Virginia law prohibits Mr. Rogers from serving as coach of the basketball team at MHS while he is principal at SMS. We cannot say the ALJ's decision was arbitrary or capricious or clearly wrong.

For the foregoing reasons, the decision of the circuit court is reversed, and this case is remanded for entry of an order affirming the decision of the ALJ.

Reversed and remanded.

Judge FRED RISOVICH, II, sitting by temporary assignment.

Justice SCOTT did not participate.

STARCHER, Chief Justice, dissenting:

(Filed Jan. 12, 2000)

I.

In reversing a well-reasoned decision of the circuit court, this Court has erroneously focused solely upon the interests of a teacher or principal who wishes to engage in extracurricular work or other activities, rather than on our clear law that school hiring decisions must be based upon a professional judgment regarding the best interest of the school system as a whole. The majority opinion in this case states that "[t]he narrow issue presented in this case is whether a principal of one school may simultaneously serve as the head coach in another school." The majority totally misapprehends the basis for the circuit court's decision, and ignores the record, which is replete with evidence that indicates that the Board hired Mr. Rogers on an improper and illegal basis.

The record clearly shows that the Berkeley County Superintendent's recommendation of incumbent Coach Holmes was based upon the superintendent's evaluation, as a professional educator, as to which candidate's hiring would further the best interests of the school system as a whole. The professional opinion of the superintendent that Coach Holmes' temporary appointment should be made permanent was cavalierly rejected by a 3–2 decision of the school board. Mr. Holmes' appointment was rejected and Mr. Rogers was hired by the Board solely on the basis of private lobbying by Mr. Rogers' supporters and family members.

The majority opinion's diversionary focus upon "the narrow issue" of whether a principal may serve as a head basketball coach in another school thus misapprehends and overlooks the real issue in this case: the extent to which school board hiring decisions may ignore the sound professional opinion of the school superintendent in favor of private lobbying of board members by supporters of one job candidate.

For more than a decade, *Dillon v. Bd. of Educ. of County of Wyoming*, 177 W.Va. 145, 351 S.E.2d 58 (1986) has stood for the proposition that school board hiring decisions must consider the best interest of the entire school system, not the preferences of those who most effectively lobby school board members in private. The majority decision in this case pays lip service to the spirit of *Dillon*, stating that "[e]ducation is, of course, the primary responsibility of our school system. For this reason, we believe these types of decisions must be made by each county on a case-by-case basis." But the majority holding actually constitutes a major departure from the important and fundamental principle of *Dillon*, that school hiring decisions must be rationally based upon the best interests of the school system as a whole. The majority

has said that it is okay—in the best interests of the schools—to permit one individual to simultaneously serve as the principal of a 500–plus student middle school and as the head varsity basketball coach of the county's major high school. I disagree.

This Court should have either affirmed the Circuit Court's judgment, or remanded to the Berkeley County School Board, to reopen the hiring process, so that a head basketball coach may be selected in an open public process, based on rational criteria and the best interests of the entire county school system and its students.

## II.

Prior to the anomalous decision in the instant case, this Court has consistently followed the standard of review applied to hiring decisions of county boards of education as set forth in Syllabus Point 3, *Dillon, supra:*

> County boards of education have substantial discretion in matters relating to the hiring, assignment, transfer, and promotion of school personnel. Nevertheless, this discretion must be exercised reasonably, *in the best interests of the schools,* and in a manner which is not arbitrary and capricious.

*See also* Syllabus Point 6, *Triggs v. Berkeley County Board of Education,* 188 W.Va. 435, 425 S.E.2d 111 (1992) (emphasis added).

Totally absent from the ALJ's decision at level IV (and this Court's majority opinion) is any reference or consideration of the "best interests of the schools" requirement of *Dillon,* which the Level II hearing examiner and the circuit court properly considered. Indeed, in citing the holding of Syllabus Point 3 of *Dillon* in his order, the ALJ at Level IV did not even mention the "best interests of the schools."

The circuit court properly recognized that *Dillon* requires that the school board take into consideration the best interests of the schools in its hiring decisions. The circuit court's conclusions of law numbered 3, 14 and 16 are based upon the "best interests of the schools" criteria in *Dillon:*

> 3. The Supreme Court of Appeals of West Virginia has consistently recognized

that county boards of education must also consider the best interests of the schools in hiring decisions:

> County boards of education have substantial discretion in matters relating to the hiring, assignment, transfer, and promotion of school personnel. Nevertheless, this discretion must be exercised reasonably, in the best interests of the schools, and in a manner which is not arbitrary and capricious. Syllabus Point 3, *Dillon v. Bd. of Educ. of County of Wyoming,* 177 W.Va. 145, 351 S.E.2d 58 (1986).

> 14. Dillon mandates that the Board exercise its discretion not only reasonably and in a manner which is not arbitrary and capricious, but also in the best interests of the schools.

> 16. By ignoring Dillon's requirement that the best interests of the schools be a consideration in any decision reached by the Superintendent and the Board, the Administrative Law Judge erred as a matter of law in concluding that the best interests of the schools was not a legal standard under Dillon by which the Board was bound in exercising its discretion in hiring a men's varsity basketball coach at [Martinsburg High School].

## III.

The record below clearly shows that the Board of Education of Berkeley County did not base its decision upon the best interests of the schools; rather, its hiring process was entirely driven by private lobbying by Mr. Rogers' supporters and family. The majority opinion ignores this crucial fact.

The undisputed record evidence establishes that prior to recommending Mr. Holmes as men's varsity basketball coach, Superintendent Bennett learned that members of the Berkeley County Board of Education were contacting members of the selection committee, and were receiving public input. Superintendent Bennett felt the Board members were "overstepping their bounds as a board" and warned that their actions "could conceivably taint the whole process." Superintendent Bennett advised Board members to contact their counsel, and

subsequently, Board President Jane Miller, Board counsel Erwin Conrad and the superintendent met. The Board's attorney advised Ms. Miller and Superintendent Bennett testified that it was brought to his attention that "the Board had been lobbied, that they had, in fact, become involved in selection" and "that there had been some direct contact with Mr. Rogers and individual Board members[.]" Superintendent Bennett also testified that the Board had been contacting the members of the selection committee after they voted on Mr. Rogers and Mr. Holmes. Significantly, Superintendent Bennett believed the Board had received *ex parte* communications and become involved "prior to the recommendation."

Board members testified that they had received phone calls from the community about the two candidates, but that most of the calls were made on behalf of Mr. Rogers. For example, Board member George Sonnik testified that he received 42 telephone calls in favor of Mr. Rogers as basketball coach. Mr. Sonnik also admitted that he received a telephone call from Mr. Rogers' brother.

The testimony of all·five Board members was taken at the Level II hearing, all of whom acknowledged that they had not evaluated Mr. Holmes. Board members admitted that their vote for Mr. Rogers was based upon community input. One board member, John Miller, acknowledged at the Level II hearing that he did not even know Mr. Holmes, until he "walked in here today."

*Dillon* requires that hiring decisions be based upon the best interests of·the schools. Clearly, the interest of the schools is best promoted by a policy which requires hiring decisions to be made based on a fair and rational evaluation of the candidates and not undocumented, *ad hoc,* lobbying by supporters of one candidate.

The Board's process for selecting a coach for Martinsburg High School was an exercise in the art of political connections and backdoor lobbying, in which Rogers' supporters contacted Board members for the purpose of influencing their vote. The record is undisputed that the Board did not conduct any independent evaluation of the candidates. Board members acknowledged that commu-

nity support and personal preferences were the primary factors in the selection Mr. Rogers. *Dillon* does not allow a school board's selection of coaches to. be based upon private lobbying of Board members. *Cf. Mason County Bd. of Educ. v. State Superintendent of Schools,* 165 W.Va. 732, 274 S.E.2d 435 (1980) (while citizens can initiate complaints against an employee of a school system, the evaluation of the competency of professional and administrative school personnel is placed in the hands of school professionals).

In its final order, the circuit court properly concluded as a matter· of law that "[t]he Board's rejection of the Superintendent's recommendation of Mr. Holmes and its subsequent choice of Principal Rogers was unlawfully and arbitrarily ·based on an unscientific measurement of public input and opinions regarding public preference of Mr. Rogers as basketball coach, a factor which cannot lawfully serve as the basis for such a decision."

Based upon the undisputed record evidence, the circuit court properly concluded that the Level IV ALJ erred as a matter of law in approving a hiring Process by the Board which was based upon uncontrolled public input contrary to *Dillon.*

## IV.

The circuit court in its final order recognized that the Superintendent of Berkeley County, who was charged with the responsibility under *W.Va.Code,* 18A–4–16 [1996], of recommending a coach to the school board, considered the best interests of the entire school system in recommending the appellee for the coaching position. The circuit court found that "[t]here is no evidence in the record that responds to or otherwise rebuts Superintendent Bennett's rationale for concluding that the best interests of the school system required that a principal such as Mr. Rogers focus his·entire attention upon his responsibilities as principal of a large middle school."

In a memorandum to the Board, the superintendent explained that his "final decision is based on what [he] feels is best for Berkeley

County Schools and particularly the academic growth of the system:"

1. Past history would indicate that administrators (principals) have been removed from extra-duty activities which have run concurrently with their administrative contracts, i.e., school coordinators, school referral agents, etc. By employing Mr. Rogers as Principal of South Middle School and an extra-duty contract for coaching at Martinsburg High School, we would be reviving a problem that has already been solved.

3. The importance of the principalship in developing quality instructional programs has been proven time and time again by research to be the key element in a successful school program. As we continue to make schools and teachers more accountable, the principalship will become even more important.

4. What we accept as our lowest standard is our standard. As an example, if we are to instruct [one principal] to remain at his school longer in the evenings, can we then turn around and excuse Dave Rogers for basketball practice or to leave early for an away game.

5. I would predict that we will experience a deterioration in the effectiveness of the South Middle School faculty. We have already picked up on some of these indicators.

At hearing, Superintendent Bennett testified that he recommended Mr. Holmes as basketball coach because Mr. Holmes

... had served as the interim coach for a year and had successful evaluations and in fact on his evaluations been recommended for reemployment by the athletic director.

He was a member of the faculty in the building at Martinsburg High School. He had had several years in coaching in various sports and had been successful, and I felt that for Martinsburg High School and for the system, that for the two candidates, he was the better candidate.

Moreover, Superintendent Bennett testified that he "firmly believe[s] that the most vital, important thing in the school system is what you do academically, whether kids do

achieve and whether they do remain in school, and I think that—without any question, the principal directs those activities and I think it's the most important position as far as success in a school system[.]"

By statutorily delegating to the superintendent the responsibility of recommending coaches for employment, the Legislature has recognized the managerial prerogatives of the superintendent in deploying personnel in the manner which he considers most likely to achieve the overall educational objectives of the school system as a whole. Moreover, as discussed above, the Superintendent was concerned about the Board's selection of a coach based upon community input, rather than the best interests of the schools.

In its final order, the circuit court properly recognized that the power of the superintendent must be exercised in the best interests of the schools, and that this was the ground upon which the superintendent recommended Mr. Holmes to serve as coach at Martinsburg High School.

The circuit court further found that "there is no dispute in the record at either Level II or at Level IV that Superintendent Bennett's responsibility in recommending coaches and other school personnel for hiring is to take into consideration the best interests of the entire county school system." The circuit court properly concluded that "Superintendent Bennett's recommendation of Mr. Holmes as men's varsity basketball coach was based upon the valid legal criteria that the best interests of the schools would not be served by having the full-time [South Middle School] principal charged with 'administrative and instructional supervisory responsibility for the planning, management, operation and evaluation of the total educational program' of over 500 children also serve as varsity coach at [Martinsburg High School]."

The circuit court's findings of fact and conclusions of law as they relate to the best interests of the schools are clearly supported by the undisputed record evidence and the criteria established in *Dillon.*

V.

In addition to the glaring defects in the hiring process of the Board in this case, the

majority also ignored the undisputed record evidence which shows that the best interests of the children at South Middle School are not served by having Mr. Rogers act as principal of South Middle School and varsity basketball coach at Martinsburg High School.

The record shows that South Middle School, where Mr. Rogers serves as principal, has the highest drop-out rate and is among the lowest in attendance rate and promotion rate. While the majority opinion essentially concludes that Mr. Rogers' responsibilities as principal at South Middle School do not preclude him from serving as varsity basketball coach at Martinsburg High School, there is absolutely no consideration given to what the county superintendent found to be in the best interests of the students at South Middle School.

The circuit court stated that "[w]hile the school report card for SMS does not indicate that principal Rogers is responsible for such low marks, such a report card supports Superintendent Bennett's view that the best interests of the schools requires principals at large middle and high schools to serve full time and not coach."

The interests of the children of South Middle School would best be served by a principal who is devoted full-time to the planning, management, operation and evaluation of the total education program of his school rather than focusing on the success of a basketball program at another school. The majority opinion gives no consideration to the educational interests of the students at South Middle School. Indeed, the majority suggests that Mr. Rogers has assistants who can perform his job so that he can dedicate his time to varsity coaching at Martinsburg High School. This Court overlooks the important fact that the principalship at any large school is a full-time position and that the principal, not his assistants, is charged with the "administrative and instructional supervisory responsibility for the planning, management, operation and evaluation of the total educational program of the school ... to which he is assigned." *W.Va.Code*, 18A–2–9 [1990].

The evidence below is undisputed that the responsibilities of a principal at a large middle school are full-time and that they extend beyond the dismissal of students at the end of each school day. This Court overlooks the fact that principals have responsibilities after school. At the Level IV hearing, Rick Deuell, the principal of Martinsburg High School, was questioned about his full-time responsibilities and testified as follows:

Q ... And would you agree that the principal's duties are full-time?

A My duties are very full-time. Yes, sir.

Q And that's—in fact, I think you said that it's more than just a 7:00 to 3:00 type job, isn't that correct?

A Yes, sir. My job is way more than 7:00 to 3:00. I'm responsible for the entire operation of the school.

Q And, in fact, I believe you have—what time do you arrive at the school in the morning?

A 6:15.

Q And that goes on to, what, 3:00 in the evening?

A I have if I have activities, I like to leave at 3:30 so I can get back; if not, I'll stay as I need to.

Q And most principals do, in the school system, correct? And you have after-school functions that you have to attend in the evenings, too?

A That's correct. That's correct. ·

Superintendent Bennett also testified that "the principalship in any school, and particularly a high school or a middle school is a full-time job" which includes extra duties after school. Superintendent Bennett further explained that "the research, for years, has pointed to the key element in any effective school program is the building level principal, and how effective they are."

As a practical matter, in light of incidents at Columbine High School in Littleton, Colorado and other schools throughout the country, our law properly requires a principal to dedicate his attention to the full-time responsibilities of overseeing the management, administration, education, supervision, welfare and safety of the students and faculty at his school. The overwhelming responsibilities of a principal, especially in light of the recent

school violence which has shocked our country, mandate that the principal be present at his school, not away, somewhere else, coaching a varsity basketball game for another high school. Coaching men's varsity basketball cannot be more important to a principal than a principal dedicating his full-time attention to his increasingly demanding responsibilities. The circuit court's decision was consistent with *Dillon,* and in the best interests of South Middle School children, and should be affirmed.

### VI.

For the foregoing reasons, I dissent. I am authorized to state that Judge Risovich, sitting as Special Justice, joins in this dissent.